UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>1702 UNION STREET, BANGOR, MAINE<br><br>THE PERSON OF DANA CANNON | No. 1:21-mj-00099-JCN |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jonathan L. Richards, being duly sworn, depose and state as follows:

### INTRODUCTION

1.  I am a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA"). I have been a Special Agent with Maine Drug Enforcement Agency ("MDEA") and its predecessor agencies since 1981. I have been a police officer since 1979. I am a 1981 graduate of the Maine Criminal Justice Academy.

2.  During the course of my law enforcement career, I have participated in numerous investigations relating to the distribution of controlled substances, including fentanyl and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 846 and 841(a)(1). I have conducted hundreds of drug trafficking investigations, seized controlled substances, including cocaine, opioids and methamphetamine. I have prepared and participated in the execution of hundreds of search warrants that resulted in the seizure of controlled substances and evidence of their distribution. I have interviewed hundreds of confidential informants and defendants involved in drug distribution. This work has resulted in the arrest and conviction of hundreds of individuals for unlawful trafficking, cultivation, possession and furnishing of controlled substances. Through this experience and training, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed,

1

and with the methods of payment for such drugs. I am familiar with the common appearance, packaging, texture, and smell of narcotics including fentanyl, heroin, oxycodone, and other illegal drugs.

3. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, the mail and private delivery services as well as a variety of other means to transport and distribute narcotics and proceeds of narcotics trafficking. Further, I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions. I also know that individuals involved in the distribution of controlled substances frequently talk in code, either during conversations or while utilizing the text messaging function within their cellular telephone, as a means with which to avoid detection and apprehension by law enforcement. In addition, through investigations and training, I know that drug traffickers may: (a) not maintain cellular telephones for significant periods of time; (b) obtain cellular telephones with false identification information; and/or (c) obtain cellular telephones which do not require the purchaser to disclose personal identification information during the transaction. Such methods are utilized in order for those involved in illicit drug activity to avoid discovery by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, phone analysis, and information obtained from the MDEA and other law enforcement personnel, witnesses, and confidential sources of information. In addition, I incorporate by reference here the information comprising my Affidavit in support of a Complaint

against Brenda J. SHABOSKI ("the Complaint Affidavit") submitted contemporaneously herewith, which I have further provided and fully adopt as an "Appendix" below.

## PURPOSE OF AFFIDAVIT AND LOCATIONS TO BE SEARCHED

5. The purpose of this Affidavit is to set forth facts for the Court to determine whether sufficient probable cause exists in support of my application for a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing the search for and seizure of evidence of the crimes of:

   a. distribution of controlled substances including, but not limited to, fentanyl, heroin and cocaine, in violation of Title 21, United States Code, Section 841(a)(1);

   b. conspiracy to possess with intent to distribute, and to distribute, controlled substances including, but not limited to, fentanyl, heroin and cocaine, in violation of 21 U.S.C. § 846; and

   c. unlawful possession of firearms by users of or persons addicted to any controlled substance, in violation 18 U.S.C. § 922(g)(3).

from the following locations:

1702 Union Street, Bangor, Maine, and any outbuildings, trailers, garages, basement, or closets with common access among the occupants of 1702 Union Street, Bangor, Maine ("the Target Location"). The Target Location is a single family 1 and ½ story wood frame house with gray siding, white trim, red window shutters and a gray asphalt shingled roof, approximately 1/10th mile past Sprague's Nursery & Garden Center (as more fully described in **Attachment A**). A digital photograph of the Target Location I took last month is reproduced below:



Dana CANNON, solely to the extent he is found to be present at the Target Location. CANNON's Maine Bureau of Motor Vehicles photograph is provided below:



6. This warrant is designed to allow a search of where SHABOSKI is residing, as well as CANNON, who also stays at the Target Location. In addition, this warrant requests a search of the person of CANNON, solely to the extent he is found to be present at the Target Location.

## ITEMS TO BE SEIZED

a. Paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances, for example: plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics;

b. Paraphernalia for manufacturing counterfeit pills including pills presses and precursor chemicals;

c. Documentary or other items of personal property that tend to identify the person(s) in residence, occupancy, control or ownership of the respective locations to be searched, including but not limited to mortgage statements and rental agreements, photographs, cancelled mail, personal telephone books, identification documents and keys;

d. U.S. currency;

e. Firearms and ammunition;

f. Safes or other secure storage containers and the contents thereof (without the need for a separate search warrant)

g. Books, records, receipts, notes, and ledgers relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

h. Proceeds of drug sales and records of drug trafficking including personal property;

i. Evidence pertaining to obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers;

j. Electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and or store the information described above;

k. Cellular and/or portable telephones and their contents for evidence of the aforementioned crimes;

l. smart phones, PDAs, iPods and other similar data storage devices and their contents for evidence of the aforementioned crimes;

m. retained copies of tax returns;

n. books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization.

## FACTS SUPPORTING PROBABLE CAUSE

7.   This investigation has been ongoing since October 2020 and is led by the DEA, with support from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"),[1] MDEA, and local law enforcement. Through my direct involvement in this investigation since that time, I believe that SHABOSKI and others are involved in distributing controlled substances including, but not limited to, fentanyl, heroin and cocaine, from the Target Location, conspiring to do so, and aiding and abetting such distribution.

8.   As detailed in the Complaint Affidavit incorporated by reference herein, I have personally conducted interviews of individuals with first-hand knowledge of SHABOSKI and the Target Location, conducted physical surveillance of the target location, reviewed various law enforcement reports and memoranda of witness interviews, and reviewed business records concerning SHABOSKI and the Target Location.

9.   On the basis of my investigation, and based on my experience and training in drug crime investigations, the Target Location was the site of significant and continuous illegal drug distribution and use by SHABOSKI and others from at least mid-2020 to December 10, 2020, at which time the Target Location became involved in a homicide investigation. The investigation concerned the shooting death of an individual at the Target Location. I further understand from reviewing police reports that there was an earlier double-shooting at the Target Location in June 2019.

10.   In 2021, I continued my investigation of SHABOSKI and the Target Location. My recent investigation indicates that the Target Location remains an active site for the use and

---

[1]   Drug traffickers are known to possess firearms in order to defend themselves from potential violence arising in the context of drug transactions, as well as to act as a deterrent against those seeking to steal or rob drugs from them.

purchase of illegal drugs. As detailed further here, I believe probable cause exists to believe that the Target Location contains contraband and evidence of crimes presently.

11. For example, as detailed in the Complaint Affidavit incorporated by reference herein, on March 4, 2021, a Confidential Source ("CS-1")[2] completed a controlled buy of approximately a 1/2 gram of fentanyl for $100.00 as well as $100.00 worth of crack cocaine from the Target Location. This controlled buy, based on my electronic monitoring and surveillance of the incident as well as my debrief with CS-1, was arranged for and aided and abetted by SHABOSKI. SHABOSKI coordinated with two different drug dealers present in the downstairs common area of the Target Location by asking them to provide the different drugs to be sold. CS-1 observed one or more other individuals present in the Target Location who appeared to be under the influence of illegal drugs.

12. I have also reviewed a Bangor Police Department report prepared by Officer Alex Maxsimic concerning a March 7, 2021, reported incident at the Target Location.

13. On March 7, 2021, at 12:32 a.m., according to the information in the report, Bangor Police were dispatched to the Target Location in response to an emergency call placed by SHABOSKI concerning an overdose victim at the Target Location. According to the report, SHABOSKI permitted Officer Maxsimic to enter the Target Location. SHABOSKI then explained to Officer Maxsimic that an individual there had used heroin intravenously, and that she had found the victim in the kitchen after the heroin use.

---

[2] All witnesses are referred to in the male gender solely for ease of reference, regardless of actual gender. CS-1 had a pending criminal charge in Maine Superior Court and provided information hoping for consideration on his pending charge. No promises were made to CS-1 with respect to the outcome of his pending case, but he was told that his cooperation would be forwarded to the prosecuting attorney responsible for the pending matter. The information provided by CS-1 has been corroborated and determined to be reliable.

14. While emergency medical personnel worked to revive the overdose victim,[3] Officer Maxsimic observed in the kitchen area of the Target Location a small scale with a small mound of white and light brown powder on top of it. By its color and consistency, the powder appeared to Officer Maxsimic to be heroin. As reported, SHABOSKI indicated to Officer Maxsimic and other Bangor Police officers present that these drugs were not hers. The Bangor Police seized the suspected heroin as well as the scale, but destroyed this evidence several days later.

15. In connection with and following the earlier controlled buy, I instructed CS-1 to continue telephonic contact with SHABOSKI to inquire about additional opportunities to purchase drugs at the Target Location. CS-1 continued such communications. I have since received from CS-1 and listened to an audio recorded voicemail message left by SHABOSKI on CS-1's cell phone on March 11, 2021 at 4:50 p.m.

16. CS-1, according to his report to me, had called SHABOSKI prior to March 11, 2021, and left a voicemail message asking, in sum and substance, whether SHABOSKI had any drugs that could be purchased at the Target Location.

17. The March 11, 2021 at 4:50 p.m. voicemail was as follows: "Hey [CS-1], Brenda here. You might want to call me back, as soon as you can. You'll be very happy. Talk to you soon. Bye bye."

18. I confirmed with CS-1 that the voicemail was left from a phone number CS-1 had been using to remain in contact with SHABOSKI. Based on CS-1's description of his prior calls to SHABOSKI seeking drugs, as well as CS-1's controlled buy at the Target Location so close in

---

[3] The victim ultimately survived this overdose incident.

time to the voicemail, I believe that SHABOSKI's reference to "you'll be happy" in the voicemail was a reference to drugs being available for purchase by CS-1 at the Target Location.

19. Recently, on April 14, 2021, I conducted an interview of the Cooperating Witness ("CW-1")[4] detailed in the Complaint Affidavit, concerning his first-hand knowledge of drug-related activity at the Target Location.

20. CW-1 stated that the last time he had used drugs with SHABOSKI had been "late last night" (i.e., the evening of April 13, 2021), and that he had used drugs at the Target Location.

21. CW-1 stated that he had purchased drugs from a "kid named Matt" inside the Target Location on April 13, 2021. CW-1 additionally stated to me that they (who I understood to mean CW-1 and SHABOSKI) had then used crack cocaine together at the Target Location that evening, and that CW-1 had also purchased and used heroin there.

22. CW-1 informed me that he had observed other people purchase drugs from "Matt" the evening of April 13, 2021 inside the Target Location, to include a male individual known to CW-1 by the street name of "Blue."

23. I recently have conducted physical surveillance of the Target Location. In doing so, on April 5 and April 7, 2021, I observed a silver 2006 Mazda sedan with Maine passenger registration number 9987XZ assigned to an individual named Matthew KELLY, of Orono, Maine.

---

[4] CW-1 is not currently charged with any crime and no criminal charges are contemplated with respect to his conduct at this time. A criminal record check indicates that CW-1 has prior federal drug convictions for cocaine distribution in 1999, and was charged with misdemeanor unlawful possession of scheduled drugs in August 2020 in Maine. I do note that, while conducting physical surveillance of 1702 Union Street on April 8 and 13, 2021, I observed CW-1's vehicle parked in the driveway at the property. Neither I nor any other law enforcement officer had asked or directed CW-1 to go to the premises. I therefore conducted the follow-up interview of CW-1. CW-1 provided me with information pursuant to a standard proffer agreement conferring direct use immunity. The information provided by CW-1 has been corroborated and determined to be reliable.

9

24. Based on my investigation to date, including information reported to me by ATF Special Agent Justin Blais as well as local law enforcement, the individual known by the street name "Blue" is Dana CANNON. In conducting physical surveillance of the Target Location recently, on April 5 and April 7, 2021, I have observed a 2004 gold Nissan vehicle with Maine disabled veteran registration number 487D assigned to CANNON, who Bureau of Motor Vehicle records list as having an address of 1702 Union Street in Bangor, the Target Location.

25. As detailed above, CW-1 observed CANNON a/k/a "Blue" purchase drugs from "Matt" on April 13, 2021. My investigation has further indicated that CANNON has been involved with drugs at the Target Location since at least mid-2020. For example, in my earlier interviews of both CW-1 and CS-1, each witness separately stated that "Blue" had a girlfriend who had stayed with "Blue" at the Target Location in 2020, whom "Blue" had "pimped out" in exchange for drugs. CW-1 informed me during my interview of him that SHABOSKI would sometimes have "Blue" retrieve drugs from within the Target Location for her to sell to CW-1.

26. In ATF Special Agent Blais' interview of the Cooperating Defendant ("CD-1"),[5] CD-1 had stated that CD-1 had observed "Blue" trade guns for drugs. Separate and independent from this information provided by CD-1, CS-1 had informed me during my interview of him that "Blue" had asked him for a ride to buy guns, and although CS-1 had declined, during later conversations with CANNON a/k/a "Blue," CS-1 had learned that CANNON a/k/a "Blue" was buying guns and selling them for 20-30% over cost. CS-1 observed CANNON a/k/a "Blue" in possession of a silver 9mm handgun at the Target Location.

---

[5] CD-1's felony case is pending in the U.S. District Court for the District of Maine. CD-1 provided Special Agent Blais with information in December 2020 pursuant to a standard proffer agreement conferring direct use immunity, and has since entered into plea and cooperation agreements with the Government, seeking to cooperate with the hope of receiving prosecutorial or judicial consideration for his pending charge. CD-1 has been made no promises with respect to the outcome of his case. The information provided by CD-1 has been corroborated and determined to be reliable.

27. Given the recency of his drug involvement and historical role with guns and drugs at the Target Location, a search of the person of CANNON a/k/a "Blue" is requested here, upon such facts showing probable cause, as well as of any room or space occupied by CANNON a/k/a "Blue" within the Target Location, whether rented to him or provided by SHABOSKI rent-free.

28. Finally, although my investigation has indicated that CANNON a/k/a "Blue" is the only other additional occupant of the Target Location, the present search warrant is sought to include the entire interior of the Target Location, including any rooms, spaces, or areas as may be occupied with or by other individuals who are staying there.

29. As set out in my Complaint Affidavit, the Target Location has historically been used and considered by those who frequent the place as a "drug house" and a "flop house." The witnesses interviewed in the course of the present investigation were consistent on the point that the people present at the Target Location were there in connection with buying, selling, and/or using illegal drugs. In addition, the evidence I obtained through witness interviews did not indicate the existence of any private, separated, or secured areas of dwelling distinct from the common areas utilized for drug distribution and use within the Target Location.

30. Additionally, the Travelers records submitted by SHABOSKI in December 2020 concerning her homeowners policy claim, as referenced in my Complaint Affidavit, do not indicate the existence of separate living units or private spaces within the Target Location. Such records contain a series of photographs taken of the interior of the Target Location in December 2020 by an insurance inspector. Based on my review of the photographs, including those provided below for reference, bedrooms appear full of debris and some entryways appear to have no doors on hinges:





31.     In short, the evidence I have developed throughout the course of my investigation indicates that, to the extent any individuals besides SHABOSKI and CANNON a/k/a "Blue" presently reside at the Target Location, probable cause exists to search the complete interior of the home, as well as all outbuildings and curtilage, for the reasons described. On the basis of my training and experience, the drug activity which has occurred and continues to occur at the Target Location strongly suggests that contraband and evidence of crime is to be found throughout the premises.

## TRAINING AND EXPERIENCE OF AFFIANT

32. Based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that:

   a. drug traffickers often store drugs in private places including in their residences and their vehicles;

   b. drug traffickers often possess and store firearms in their residences in order to protect themselves, their supplies of drugs, and/or drug proceeds;

   c. narcotics traffickers often maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their on-going narcotics business;

   d. it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them including their residences and their vehicles;

   e. it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

   f. narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

g. even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

h. it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses, vehicles or other locations which they maintain dominion and control over;

i. when drug traffickers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Traffickers often commingle narcotics proceeds with money generated by legitimate businesses;

j. traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

k. traffickers take or cause to be taken photographs of themselves, their associates, and their property. That these traffickers usually maintain these photographs in their possession;

l. drug traffickers often use electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to

generate, transfer, count, record and or store information in furtherance of their drug trafficking activities;

m. drug traffickers often use cellular and/or portable telephones, smart phones, tablets (such as an IPad) and other electronic equipment and data storage devices in furtherance of their criminal activities;

n. narcotics traffickers often utilize multiple vehicles in furtherance of their drug trafficking to include rental vehicles and vehicles registered in the names of third parties.

## CONCLUSION

33. Based on my training and experience, as well as upon my familiarity with this investigation, including information obtained from physical surveillance, I submit that there is probable cause to believe that the above-described Target Location presently contains items that constitute evidence of the commission of criminal offenses, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of 21 U.S.C. § 841(a)(1). The specific items that there is probable cause to believe will be found in the Target Location are set forth in **Attachment B**. I respectfully request that a search warrant be issued for the Target Location, and for the person of Dana CANNON.

Dated at Bangor, Maine, this 20th day of April, 2021.

Jonathan L. Richards
Task Force Officer
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Apr 20 2021

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title